

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-355-CV

BOBBY FERACHI                                                    APPELLANT

V.

SHAWN CADY                                                       APPELLEE

------------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

After a jury trial, the trial court rendered judgment awarding Appellee Shawn Cady damages in his breach of contract claim against Appellant Bobby Ferachi. Ferachi now appeals from that judgment. In four issues, Ferachi argues that the trial court erred by failing to render judgment on his affirmative defense, that the contract at issue was unenforceable as a matter of law

---

[1] *See* Tex. R. App. P. 47.4.

because it was nothing more than an agreement to agree, that the trial court erred by refusing to render judgment on his Deceptive Trade Practices Act ("DTPA") claims, and that the contract was void under section 39.004 of the Texas Business and Commerce Code. Because we hold that the contract was not unenforceable as a matter of law and that section 39.004 was not applicable to the contract at issue, we affirm.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Cady and Ferachi became acquainted when Cady was in the process of divorcing Ferachi's ex-wife. The two became friends, and on July 23, 2005, they entered into a written agreement ("the contract") under which Ferachi agreed to buy and Cady agreed to sell an interest in a four-bedroom houseboat ("Houseboat").[2] The contract provided that Ferachi would make monthly

---

[2] Although sometimes used interchangeably, the terms "agreement" and "contract" are not synonymous. "Agreement" refers to "a manifestation of mutual assent on the part of two or more persons," whereas the term "contract" refers to "a promise or a set of promises *for the breach of which the law gives a remedy*." Restatement (Second) of Contracts §§ 1, 3 (1981) (emphasis added); *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App.—Texarkana 1989, no writ) (noting that the term "agreement" is more broad than the term "contract" and that parties might have an agreement but not a contract). Throughout this opinion, we use the term "agreement" to refer to the parties' mutual assent to the sale of the interest in the Houseboat and the term "contract" to refer to the writing expressing that agreement. When quoting from parts of the contract, we use the term that the parties used in the writing.

payments of $2,500 to Cady, plus a proportionate share of the slip fees and insurance. The contract also provided that Ferachi would give Cady ten days' notice if he could not make a scheduled payment. In such case, Cady would furnish a line of credit to Ferachi, not to exceed $10,000, to cover any missed payments by Ferachi. The parties agreed that they would make arrangements in the future to repay any amounts extended under the line of credit, but "[n]otwithstanding the foregoing," any sums owed to Cady by Ferachi at the time the mortgage was retired would be incorporated into a promissory note with payment terms agreed to at that time. The contract also stated that Ferachi's obligation under the contract was "absolute and unconditional" and that "[i]n the event that Ferachi fails to satisfy his obligations hereunder or in the event that Ferachi elects to cease paying all or any portion of the payment obligations hereunder, Ferachi shall continue to be liable for his proportionate share of the cost of the Boat as set forth herein."

At the time of the contract's execution, Ferachi gave Cady a check for $8,945, which included two of the $2,500 payments and payments for insurance and the slip fee. Ferachi failed to make any more payments after demand by Cady, and Cady brought suit against him for breach of contract and fraud in the inducement.

3

Ferachi filed a counterpetition alleging conversion of his personal property that had been on the Houseboat. He also alleged that the contract was void because it was a consumer credit contract that did not include the statutory notice of rescission under business and commerce code sections 39.004 and 39.008. He also alleged a DTPA violation and asserted affirmative defenses, including the defense that the written agreement was too vague and ambiguous to constitute a contract.

At trial, Cady testified that Ferachi approached him about partnering on the two-bedroom houseboat that Cady already owned and that when Cady told him that the boat was too small for two families, they looked into getting a four-bedroom houseboat. He stated that the original agreement was that he would put down his half of the purchase price of the Houseboat as the downpayment and that Ferachi would make the monthly payments on the other half. But after Cady purchased the Houseboat and took out a note on it, Ferachi told him that he could not afford the monthly payments. They then entered into the contract under which Ferachi would be responsible for only a third of the cost.

Ferachi claimed that they had no agreement before Cady bought the bigger Houseboat. He asserted that Cady bought the Houseboat on his own and then approached Ferachi with the suggestion that he buy an interest.

4

Ferachi testified that two days after signing the contract, he left a message for Cady that he had made a mistake and was not willing or able to buy the interest in the Houseboat. He stated that Cady returned his call and told Ferachi that they would talk about it when Cady returned from his trip. Ferachi also testified that he did not understand Cady to be in the business of selling boats and that, although he knew Cady had sometimes loaned money to people, he did not understand Cady to be in the business of making loans.

Joseph Flowers, the owner of Xtreme Marine, where the Houseboat was purchased, testified that before Cady bought the Houseboat, he overheard Ferachi and Cady in conversations discussing partnering on a houseboat, and that after the Houseboat was purchased, Ferachi held himself out to Flowers as a partner in the Houseboat.

The jury found that Ferachi "fail[ed] to comply with the agreement," that $105,000 would fairly compensate Cady for "his damages proximately caused by the breach," and that Ferachi did not commit fraud in the inducement. With respect to Ferachi's DTPA claim, the jury found that the transaction contemplated by the contract was a "[c]onsumer transaction." But the jury further found no damages resulting to Ferachi from any false, misleading, or deceptive act or practice by Cady in the solicitation of the transaction.

5

The jury also found that the contract left a material term open for future negotiations, that Cady did not breach the contract such that Ferachi's performance was excused, that Cady did not repudiate the contract, that Ferachi did not rescind the contract on or before the third day after the contract was signed, and that Cady did not convert Ferachi's property.

Cady filed a post-trial "brief in support of the judgment" asking the trial court to disregard the jury's answer to question nine of the court's charge. He contended that the jury's answer to that question, which asked if a material term had been left open, was immaterial in that the contract contained two contracts—one for the purchase of an interest in the Houseboat and one for the line of credit. Thus, the jury's finding that a material term was left open did not affect the jury's determination that Cady should be awarded $105,000 for breach of the contract to buy the Houseboat interest. The trial court rendered judgment for Cady on his breach of contract claim and awarded him $105,000 as damages.

## ANALYSIS

In his second issue, Ferachi contends that the contract sued upon was unenforceable as a matter of law because it constituted nothing more than an agreement to agree. Question nine of the court's charge instructed the jury that "[i]t is your duty to interpret the language of the agreement to determine

6

if a material term of the agreement was left open for future negotiation" and asked whether the agreement left a material term open for future negotiation. The jury answered "yes." The trial court did not expressly rule on Cady's motion to disregard the jury's answer but ultimately rendered judgment awarding Cady damages for breach of contract.

A trial court generally may disregard a jury verdict and render judgment notwithstanding the verdict ("JNOV") only if (1) no evidence supports the jury finding on an issue necessary to liability; (2) the evidence conclusively establishes the right of the movant to judgment; (3) the evidence conclusively negates the right of the opponent to judgment; or (4) the evidence is insufficient to raise a material fact issue.[3] But a trial court may, without a motion by a party, disregard a jury's finding on an issue erroneously submitted, such as a question of law.[4]

---

[3] *See* Tex. R. Civ. P. 301 (allowing trial court to render JNOV if jury finding has no support in evidence or if directed verdict would have been proper; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex. 1991); *Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (setting out circumstances when directed verdict is proper); *Hogue v. Propath Lab., Inc.,* 192 S.W.3d 641, 646 (Tex. App.—Fort Worth 2006, pet. denied).

[4] *Alcorn v. Brown*, 536 S.W.2d 80, 82 (Tex. Civ. App—Fort Worth 1976, writ ref'd n.r.e.); *see also Se. Pipe Line Co., Inc. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999) (noting that a jury's answer to a question may be disregarded if question calls for a finding on a question of law).

Ferachi argues that there was only one contract between the parties, that the contract allowed him to miss payments, that the contract capped his maximum liability for missed payments at $10,000, that the $10,000 would be extended as credit, and that the repayment terms for any amount extended would be addressed in a future agreement between the parties. He further argues that no such future contract was ever made by the parties. Thus, he contends, the contract at issue constitutes nothing more than an unenforceable agreement to agree and is void and unenforceable as a matter of law.

The parts of the contract on which Ferachi relies state as follows:

> 2.  . . . In the event that, for whatever reason, Ferachi is unable to make all or a portion of any monthly payment, he will provide notice to Cady not less than ten (10) days prior to the scheduled payment date in order to permit Cady to make up any shortfall in such monthly payment. Payments made by Cady on behalf of Ferachi shall be handled in accordance with paragraph 4, below.

> . . . .

> 4.  Payments made by Cady to satisfy the Ferachi payment obligations, including full or partial monthly payments as set forth in paragraph 2 or payments made by Cady with respect to Ferachi's share of the Maintenance Fees shall be repaid by Ferachi under a line of credit furnished by Cady not to exceed $10,000.00 with all advances under such line bearing interest at the rate of ten percent (10%) per annum. Repayment of advances made by Cady to Ferachi or for the benefit of Ferachi will be in accordance with arrangements made between the parties. Notwithstanding the foregoing, however, if any sums or [sic] owed by Ferachi to Cady at the time the mortgage on the Boat is retired, the remaining sums

8

owed by Ferachi to Cady shall be incorporated into a promissory note with payment terms agreed to at such time.

. . . .

7.      The obligation of Ferachi to make his proportionate share of the purchase price of the Boat is absolute and unconditional and is equivalent to the obligations Cady owes to the mortgagee under the purchase note.  In the event that Ferachi fails to satisfy his obligations hereunder or in the event that Ferachi elects to cease paying all or any portion of the payment obligations hereunder, Ferachi shall continue to be liable for his proportionate share of the cost of the Boat as set forth herein.  Ferachi shall have either the option to find a substitute purchaser to assume the remaining portion of Ferachi's obligations hereunder or to continue to make payments in accordance with the parties' agreements hereunder.

Contrary to Ferachi's assertions, this language gave him the option to completely cease making payments only if he found a substitute purchaser. Furthermore, the contract did not cap his liability under the contract at $10,000 should he cease making payments.  Rather, Cady agreed to cover up to $10,000 of Ferachi's share while the mortgage was in effect, and Ferachi agreed to repay the amount paid by Cady under that provision.

But Ferachi is correct that paragraph four did not contain repayment terms for any amounts advanced under that paragraph.  Although the paragraph set out a maximum amount of money that would be advanced and provided what interest rate Cady would charge Ferachi for money advanced, it did not set out the terms of repayment, such as how often payments would be made

9

or what the duration of the repayment term would be. Ferachi argues that these missing terms made the entire contract unenforceable.

The issue of indefiniteness in the terms of a written agreement can arise both in the question of whether parties intended to form a contract and in the question of whether a written agreement under which the parties intended to be bound constitutes an enforceable contract. That a written agreement is indefinite as to some of the terms may indicate that the parties had no intention to be bound by the agreement, particularly when the indefinite terms are essential, rather than collateral.[5] "Whether the parties intended to enter a binding contract or merely an unenforceable agreement to make a contract in the future is ordinarily a question of fact," although a court may determine that the language of the agreement establishes as a matter of law the intent of the

---

[5] *See Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966) (holding that in the agreement at issue, "[t]he failure of the parties to reach some understanding as to price often indicates that there has been no meeting of the minds"); *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 531 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (looking at the record and determining that financing term was a material element of the bargain "as manifested by the parties' focus on that provision during negotiations" and concluding that there was no meeting of the minds creating an enforceable contract); *see also Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 555 (Tex. 1972) (noting that "parties may agree upon some of the terms of a contract, and understand them to be an agreement, and yet leave other portions of an agreement to be made later").

parties to be bound.[6] But even if parties intended to be bound by an agreement, a court may conclude that it is not an enforceable contract because its terms are too indefinite for the court to determine the parties' legal obligations and liabilities.[7] The issue of whether a contract contains all essential terms to be enforceable is a question of law.[8] If a court can determine a remedy with reasonable certainty, the court should find the contract to be

---

[6]⬆ *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 678 (Tex. App.—Houston [1st Dist.] 1996, no writ); *West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 257–58 (Tex. App.—Austin 2002, no pet.); *see also Potcinske*, 245 S.W.3d at 531.

[7]⬆ *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (stating that "[i]n order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook" and that "[w]here an essential term is open for future negotiation, there is no binding contract"); *Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.) ("If a contract is not clear and certain as to all essential terms, it will fail for indefiniteness."); *Miga v. Jensen*, 25 S.W.3d 370, 376 (Tex. App.—Fort Worth 2000), *aff'd in part and rev'd in part*, 96 S.W.3d 207 (Tex. 2002).

[8]⬆ *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 654 n.8 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App.—San Antonio 1996, writ denied); *Farah*, 927 S.W.2d at 678; *see also Playoff Corp. v. Blackwell*, No. 02-06-00249-CV, 2008 WL 5194340, at *3 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (noting that whether an agreement fails for indefiniteness is a question of law).

definite enough to grant the remedy if the evidence demonstrates that the parties intended to enter into an agreement.[9]

Although Ferachi asserted in various pleadings that there was no meeting of the minds because the terms of the contract were too vague and ambiguous, at trial he did not dispute that he understood that he and Cady were entering into a contract. Rather, he admitted that he and Cady had an agreement and that after signing the contract, he initially began performing under the contract. Neither party raised a fact issue about whether they had agreed upon terms of a contract, understanding them to be an agreement. The only question at trial was whether the absence from the contract of the terms on which the parties had not yet agreed rendered the contract too indefinite to be enforceable. Although question nine asked the jury to determine if a material term was left open, the question of whether the contract contained all the essential terms for it to be enforceable is a question of law.[10] Thus, the trial court was free to

---

[9] *Am.'s Favorite Chicken Co.*, 929 S.W.2d at 623; *Miga*, 25 S.W.3d at 376; *see also Tex. Oil Co. v. Tenneco Inc.*, 917 S.W.2d 826, 830 (Tex. App.—Houston [14th Dist.] 1994) ("The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain.") (citing Restatement (Second) of Contracts § 33(1) (1981)), *rev'd on other grounds*, 958 S.W.2d 178 (Tex.1997).

[10] *Beal Bank, S.S.B.*, 124 S.W.3d at 654 n.8; *Am.'s Favorite Chicken Co.*, 929 S.W.2d at 622.

12

disregard the jury's answer to question nine and determine as a matter of law whether the contract contained all the essential terms to constitute an enforceable contract.[11]

What terms are material or essential to a contract are determined on a contract-by-contract basis, depending on the subject matter of the contract at issue.[12] Three essential elements of a contract for sale are "(1) the thing sold, which is the object of the contract; (2) the consideration or price to be paid for the thing sold; and (3) the consent of the parties to exchange the thing for the price."[13]

Here, the subject of the sale was an interest in the Houseboat. Under the contract's terms, Ferachi agreed to pay $316,442.60 for a thirty-three percent interest in the Houseboat. He agreed to make monthly payments of $2,500.00 until the total amount was paid. The contract stated that under the mortgage

---

[11] *See Alcorn*, 536 S.W.2d at 82 (stating that trial court may disregard jury's answer to erroneously submitted question of law).

[12] *T.O. Stanley Boot Co.*, 847 S.W.2d at 221 (stating that "[e]ach contract should be considered separately to determine its material terms" and that "[i]n a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms").

[13] *Kelly v. Rio Grande Computerland Group*, 128 S.W.3d 759, 767 (Tex. App.—El Paso 2004, no pet.); *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 20 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).

on the Houseboat, Cady owed monthly payments of $3,344.78, due on the 27th of each month, and Ferachi agreed to make his share of the payment as the monthly payment became due. Ferachi agreed to notify Cady not less than ten days before the due date if he would be unable to pay the monthly payment by the scheduled payment date. Cady agreed that when Ferachi had made all the payments agreed to under the contract, and as long as Ferachi was not otherwise in default, he would transfer to Ferachi a thirty-three percent interest in the Houseboat. The contract further stated that Ferachi's obligation to make his share of payments was "absolute and unconditional." Thus, the contract was clear as to what item was being sold (an interest in the Houseboat), the price to be paid for the interest in the Houseboat ($316,442.60, paid in monthly installments of $2,500.00), and the parties' agreement to exchange the item for the price.

Under the contract's terms, a court could determine that Ferachi had an obligation to pay Cady $2,500 per month by the 27th of each month until he had paid a total of $316,442.60 and that if he failed to do so, he was in breach of the contract. The court could also determine that Ferachi could fail to make a payment but avoid defaulting under the contract by notifying Cady ten days before the payment was due that he could not make his payment. The court could further determine that under that term, Ferachi could miss up to $10,000

14

of payments without defaulting. The court could also determine that it was a breach of the contract if Ferachi failed to timely notify Cady that he would miss a payment or if he missed more than $10,000 worth of payments. The trial court could also determine the amount of damages incurred by Cady if Ferachi stopped making payments. Thus, the terms of the contract were not too indefinite for the court to determine whether Ferachi breached the contract by refusing to make payments and what the remedy for such a breach should be. Accordingly, the contract at issue was not unenforceable as a matter of law.[14] We overrule Ferachi's second issue.

In his first issue, Ferachi argues that the trial court erred by refusing to enter judgment on his affirmative defense that the contract left open a material term because the jury's determination on this question was supported by the evidence. A contract that lacks a material term is not an enforceable contract,[15] as Ferachi points out in his brief. Thus, a party may defend a breach of contract action by asserting that the contract on which the claim is based is not enforceable as a matter of law and therefore cannot support a breach of

---

[14] *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221; *Miga*, 25 S.W.3d at 376.

[15] *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221.

15

contract action.[16] An assertion that the contract lacked a material term does not establish an independent reason why a plaintiff should not recover and is therefore not an affirmative defense.[17] As discussed above, the question of whether the contract contained all essential terms for it to be enforceable is a question of law,[18] and the jury's answer to the question is therefore not determinative.[19] And, as discussed above, the contract at issue contained all the material terms necessary for it to be enforceable. Thus, the trial court did not err by refusing to enter judgment for Ferachi on this issue. We overrule his first issue.

In Ferachi's fourth issue, he argues that the contract is void as a matter of law under business and commerce code section 39.008(b)[20] and that he was

---

[16] *See id.* at 221–22.

[17] *See Phillips v. Phillips*, 820 S.W.2d 785, 791 (Tex. 1991) (stating that affirmative defense does not rebut facts asserted by plaintiff but rather seeks to establish independent reason why plaintiff should not recover).

[18] *Beal Bank, S.S.B.*, 124 S.W.3d at 654 n.8; *Am.'s Favorite Chicken Co.*, 929 S.W.2d at 622.

[19] *See Alcorn*, 536 S.W.2d at 82 (stating that trial court may disregard jury's answer to erroneously submitted question of law).

[20] Although Ferachi refers to section 39.001(b) throughout this portion of his brief, it is clear from his argument that he means to refer to section 39.008(b). *See* Tex. Bus. & Com. Code Ann. § 39.008(b) (Vernon 2002) (now Tex. Bus. & Com. Code Ann. § 601.201). Sections 39.001 through 39.009 were repealed by Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.47(a)(1),

16

entitled to a take-nothing judgment on Cady's breach of contract claim. He contends that Cady stipulated that the contract violated section 39.004 of the business and commerce code by failing to include disclosures required by that section.[21] Failure to include those disclosures is a violation of section 39.008(a).[22] Under section 39.008(b), a contract that violates section 39.008(a) is void.[23] Thus, Ferachi argues, this contract is void and cannot support a breach of contract action.

Cady, on the other hand, contends that although he stipulated that the contract did not contain the disclosures discussed under section 39.004, he did not stipulate that this contract was regulated by that section. His argument on appeal corresponds with his argument at the charge conference: the contract did not contain the notices set out in chapter 39, but the contract did not fall

---

2007 Tex. Gen. Laws 1905, 2082, and recodified without substantive changes at Tex. Bus. & Com. Code §§ 601.001–601.103 by Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.01, 2007 Tex. Gen. Laws 1905, 2027–2031, effective April 1, 2009. Throughout this opinion, we continue to cite to sections 39.001 through 39.009, which were still in effect when the parties filed their briefs.

[21] *See* Tex. Bus. & Com. Code § 39.004 (now Tex. Bus. & Com. Code Ann. § 601.052).

[22] *Id.* § 39.008(a) (now §§ 601.152, 601.154).

[23] *Id.* § 39.008(b) (now § 601.201).

under the purview of that chapter and thus was not required to have the notices. We agree with Cady.

When originally enacted in 1973, the Texas Home Solicitations Transactions Act ("the Act") applied only to consumer transactions entered into at the consumer's home. The purpose of the statute was "to protect residential occupants from high pressure door-to-door salesmen and allow a 'cooling-off' period within which the sales contract could be rescinded."[24] Under the language of the Act, it applied to any consumer transaction for the purchase of goods or services in which a "merchant" "engage[d] in a personal solicitation of the sale to the consumer at a residence" and in which "the consumer's agreement or offer to purchase is given at the residence."[25] The Act defined the term "consumer transaction" as "a transaction in which one or more of the

---

[24] *McDaniel v. Pettigrew*, 536 S.W.2d 611, 614 (Tex. Civ. App.—Dallas 1976, writ ref'd n.r.e.).

[25] Act of May 18, 1973, 63d Leg., R.S., ch. 246, § 1, 1973 Tex. Gen. Laws 574, 574–75, *repealed by* Act of May 22, 1997, 75th Leg., R.S., ch. 1008, § 6, 1997 Tex. Gen. Laws 3601, 3602; *McDaniel*, 536 S.W.2d at 614; *see also Am. Quality Roofing, Inc. v. Ipock*, 730 S.W.2d 470, 471 (Tex. App.—Fort Worth 1987, no writ) (applying the Act when salesperson approached purchaser at his home and solicited his purchase of materials and labor for roof repair, the contract terms were negotiated at purchaser's home, the contract was signed there, and purchaser had no prior business relationship with seller).

parties is a consumer."[26] Merchant was defined as "a party to a consumer

transaction other than a consumer."[27] "Consumer" was defined as "an

individual who seeks or acquires real or personal property, services, money, or

credit for personal, family, or household purposes."[28] Courts construing the

former statute declined to apply the Act when the consumer initiated the

transaction or when the parties knew each other and the transaction was

entered into after negotiations.[29]

---

[26] Act of May 18, 1973, 63d Leg., R.S., ch. 246, § 1, 1973 Tex. Gen. Laws 574, 574–75 (repealed 1997).

[27] *Id.*

[28] *Id.*

[29] *See Langston v. Brewer*, 649 S.W.2d 827, 829 (Tex. App.—Fort Worth 1983, no writ) (holding that Act did not apply to transaction for remodeling work on consumers' home even though contract was signed there when parties had been involved in a prior transaction, consumers contacted the merchant about furnishing the services, and the merchant prepared the contract after negotiations); *Coniglio v. Dallas Drapery Shops, Inc.*, 593 S.W.2d 426, 427 (Tex. Civ. App.—Dallas 1980, no writ) (holding that transaction at issue not subject to the Act when consumers contacted merchant and requested a representative be sent to their home, agent called on consumers at their home and left a prepared written contract, and consumers subsequently mailed contract to merchant); *Holmquest v. Priesmeyer*, 574 S.W.2d 173, 178 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ) (holding that Act did not apply to transaction between architect and clients even though contract was signed either at architect's apartment or clients' residence when architect contacted clients after they had asked university's dean of architecture school about obtaining an architectural design and dean had forwarded clients' name and contact information to architect); *McDaniel*, 536 S.W.2d at 615–16 (holding that Act did not apply to contract for the sale of a lot and building of a house

The legislature amended sections of the Act in 1995, broadening the statute's application to include most consumer transactions personally solicited by a merchant or merchant's agent and consented to by a consumer any place other than the merchant's place of business.[30] The committee report on the bill stated that "[t]he statute [before the amendments] does not cover transactions that take place in rented hotel rooms, restaurant parties, and other types of home parties" and that "[c]onsequently, unscrupulous merchants and salespeople who run fly-by-night operations at rented temporary locations cannot be prosecuted" under the statute.[31] The statute as amended thus supplied protection to consumers from unscrupulous merchants who previously avoided liability by entering into transactions away from a residence.

The evidence in this case does not compel the conclusion that Ferachi was entitled to the protection of the Act.[32] The evidence showed that Ferachi,

_____

when transaction is being negotiated by a licensed real estate broker, an exception under the Act, and when consumers themselves solicited the services).

[30] *See* Act of May 27, 1995, 74th Leg., R.S. ch. 926, § 1, 1995 Tex. Gen. Laws 4649, 4649 (repealed 1997).

[31] House Comm. on Business & Industry, Bill Analysis, Tex. H.B. 1885, 74th Leg., R.S. (1995), *available at* http://www.legis.state.tx.us/BillLookup/Text.aspx?LegSess=74R&Bill=HB1885 (last visited May 28, 2009).

[32] *See Holmquest*, 574 S.W.2d at 178.

a real estate agent[33] who does business in an affluent part of Dallas, engaged in negotiations with Cady that resulted in the contract. The parties arrived at the terms of the deal after discussion by Ferachi about what he could afford. The contract terms were worked out over a period of about three weeks. The parties met at an IHOP restaurant to sign the contract because it was convenient for both parties and was next to the marina. Ferachi acknowledged that when he signed the contract, he knew that Cady was not in the business of selling houseboats or in the business of loaning money like a bank. Cady testified that Ferachi was the one who brought up the idea of buying a houseboat together. Even though the jury found that the transaction was a consumer transaction, in order for the Act to be applicable and for Ferachi to be entitled to its protection, the jury would have also had to find that Cady solicited the transaction.[34]

There was no separate question asking the jury to determine which party solicited the sale of the interest in the Houseboat. But the jury was instructed in question six that if it had found the transaction was a consumer transaction,

---

[33] *See* Tex. Bus. & Com. Code Ann. § 39.002(b)(4)(B) (now § 601.002(b)(4)(B)) (excepting from statute's application the sale of real property when purchaser is represented by licensed real estate broker).

[34] *See id.* § 39.002(a) (now § 601.002(a)) (stating that the Act applies only to "consumer transaction" in which a merchant or the merchant's agent engages in a personal solicitation of a sale).

the act of soliciting the transaction was a false, misleading, and deceptive act. The jury was further instructed that Ferachi was entitled to recover any money acquired by Cady as a result of a false, misleading, or deceptive act. The evidence was undisputed that Ferachi paid $8,945 under the contract. Yet the jury awarded Ferachi no damages. Consequently, the jury impliedly found that Cady had not solicited the transaction.[35] Ferachi therefore was not entitled to the protection of the Act, Cady was not required to include in the contract the provisions required under section 39.004, and the contract therefore was not void for failing to include them. Thus, the trial court did not err by rendering judgment on Cady's breach of contract claim regardless of whether the court disregarded the jury's finding that the transaction was a consumer transaction.

Ferachi contends that the award of actual damages is not required in a DTPA claim and that he was entitled to recover $18,300, the amount of attorney's fees stipulated to in the trial court. But although the jury found that the transaction was a consumer transaction, there was no finding by the jury that Cady had engaged in any false, misleading, or deceptive act or practice under Texas law. We overrule Ferachi's fourth issue.

---

[35] *See id.*

22

In Ferachi's third issue, he argues that the trial court erred by refusing to enter judgment on his DTPA claim. Ferachi argues that because a failure to include the notices required under chapter 39 is a false, misleading, or deceptive act under the DTPA,[36] the contract at issue did not include those notices, and the jury found that this transaction was a consumer transaction, the trial court should have entered judgment in his favor on his DTPA claim. Because we have held the trial court did not err by rendering judgment on the jury's finding that Ferachi was not entitled to the protections of chapter 39, we further hold that the failure to include the notices in the contract was not a false, misleading, or deceptive act under the DTPA. Thus, the trial court did not err by refusing to enter judgment on Ferachi's DTPA claim based on the failure to include the notices under chapter 39. We overrule Ferachi's third issue.

## CONCLUSION

Having overruled each of Ferachi's four issues, we affirm the judgment of the trial court.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGSTON and DAUPHINOT, JJ.

DELIVERED:  May 28, 2009

---

[36] *Id.* § 39.008(e) (now § 601.204).

23